# SUPREME COURT OF THE UNITED STATES

### DOUGLAS OLIVER KELLY
07–11073            *v.*
### CALIFORNIA

### SAMUEL ZAMUDIO
07–11425            *v.*
### CALIFORNIA

ON PETITIONS FOR WRITS OF CERTIORARI TO THE SUPREME
COURT OF CALIFORNIA

Nos. 07–11073 and 07–11425.   Decided November 10, 2008

The petitions for writs of certiorari are denied. JUSTICE
SOUTER would grant the petition for a writ of certiorari in
No. 07–11073.

Statement of JUSTICE STEVENS respecting the denial of
the petitions for writs of certiorari.

These two capital cases raise questions concerning the
admissibility of so-called "victim impact evidence" during
the penalty phase of a capital trial. The term is a misno-
mer in capital cases because the evidence does not de-
scribe the impact of the crime on the victim—his or her
death is always an element of the offense itself. Rather, it
describes the impact of the victim's death on third parties,
usually members of the victim's family.

In the first of these cases, petitioner Douglas Kelly was
convicted of murdering 19-year-old Sara Weir. 42 Cal. 4th
763, 171 P. 3d 548 (2007). The prosecution played a 20-
minute video consisting of a montage of still photographs
and video footage documenting Weir's life from her infancy
until shortly before she was killed. The video was nar-
rated by the victim's mother with soft music playing in the
background, and it showed scenes of her swimming,
horseback riding, and attending school and social func-
tions with her family and friends. The video ended with a
view of her grave marker and footage of people riding

horseback in Alberta, Canada—the "'kind of heaven'" in which her mother said she belonged. See *id.*, at 796–797, 171 P. 3d, at 557–558.[1]

In the second case, petitioner Samuel Zamudio was convicted of robbing and murdering Elmer and Gladys Benson. 43 Cal. 4th 327, 181 P. 3d 105 (2008). Two of the victims' daughters and two of their grandchildren testified about the effects of the murders on themselves and their families. During one daughter's testimony the prosecution played a video containing 118 photographs of the victims at various stages of their lives, including their childhood and early years of marriage. The photographs showed the couple raising their children, serving in the military, hunting, fishing, vacationing, bowling, celebrating holidays and family events, and attending recognition dinners for Gladys's community service. "The last three photographs in the montage showed, in order, Gladys' grave marker with the inscription readable, Elmer's grave marker with the inscription readable, and both grave markers from a distance, each accompanied by a vase of flowers." *Id.*, at 363, 181 P. 3d, at 134.

In both cases the California Supreme Court upheld the admissibility of the videos. The court explained that the video admitted during Kelly's sentencing "expressed no outrage" and contained no "clarion call for vengeance," but "just implied sadness." 42 Cal. 4th, at 797, 171 P. 3d, at 558. Similarly, the court held that the video shown during Zamudio's penalty phase proceedings was "'not unduly emotional.'" 43 Cal. 4th, at 367, 181 P. 3d, at 137. Only one dissenting justice expressed any concern that the evidence had the potential to "imbue the proceedings with 'a legally impermissible level of emotion.'" 42 Cal. 4th, at 803, 171 P. 3d, at 575 (Moreno, J., concurring and dissent-

─────────

[1] The full video is available online at http://www.supremecourtus.gov/ opinions/video/kelly_v_california.html and in Clerk of Court's case file.

ing).  No member of the court suggested that the evidence shed any light on the character of the offense, the character of the offender, or the defendant's moral culpability.

## I

Victim impact evidence made its first appearance in this Court's jurisprudence in 1987.  *Booth* v. *Maryland*, 482 U. S. 496 (1987).[2]  In earlier landmark cases, such as *Williams* v. *New York*, 337 U. S. 241 (1949), and *Lockett* v. *Ohio*, 438 U. S. 586 (1978), evidence probative of the culpability and character of the offender and the circumstances of the offense had marked the outer limits of the kind of evidence admissible in capital sentencing.  Consistent with that precedent, in our first encounter with victim impact evidence, the Court announced a rule that categorically "prohibit[ed] a capital jury from considering victim impact evidence" that "described the personal characteristics of the victims and the emotional impact of the crimes on the family."  *Booth*, 482 U. S., at 501–502.  It was the unique character of the death penalty that justified *Booth*'s *per se* rule: The opinion relied on the fact that death is a "punishment different from all other sanctions,"

---

[2] Victim impact evidence is a category unmentioned by Wigmore's treatise or other classic works on the law of evidence.  Its inclusion in both capital and noncapital cases is a phenomenon of recent origin, arising out of the victims' rights movement of the late 1970's.  See Carrington & Nicholson, The Victims' Movement: An Idea Whose Time Has Come, 11 Pepperdine L. Rev. 1, 8 (Symposium 1984) (describing early victories of the victims' rights movement, including passage of the Omnibus Victim and Witness Protection Act of 1982, 96 Stat. 1248, which mandated the inclusion of victim impact statements in federal presentence reports); MacDonald, Towards a Bicentennial Revolution in Criminal Justice: The Return of the Victim, 13 Am. Crim. L. Rev. 649, 670 (1975—1976) (describing early "innovative" attempts to integrate victims into the sentencing process).

*id.*, at 509, n. 12, and on our earlier admonition that any decision to impose the death sentence must "'be, and appear to be, based on reason rather than caprice or emotion,'" *id.*, at 508 (quoting *Gardner* v. *Florida*, 430 U. S. 349, 358 (1977) (opinion of STEVENS, J.)).

Throughout the late 1970's and for much of the following decade, the fact that "death is a different kind of punishment from any other that may be imposed in this country," *id.*, at 357, had justified placing limits on its permissible applications, see, *e.g.*, *Godfrey* v. *Georgia*, 446 U. S. 420, 433 (1980) (plurality opinion), and requiring special procedural protections for the defendant, see *Lockett*, 438 U. S., at 604 (plurality opinion). Our decision in *Booth* flowed naturally from the same principle.

Beginning in the late 1980's, however, changes in the Court's capital jurisprudence began to weaken the procedural and substantive safeguards on which we had earlier insisted. In *Tison* v. *Arizona*, 481 U. S. 137 (1987), rather than adhere to the rule announced in *Enmund* v. *Florida*, 458 U. S. 782 (1982), which prohibited death sentences for defendants who neither killed nor intended to kill a victim, a majority of the Court held that felony murder could qualify as a capital offense. Soon thereafter, the Court rejected a challenge to a death sentence based on evidence that a victim's race enhanced the likelihood that a Georgia jury would impose the death penalty. *McCleskey* v. *Kemp*, 481 U. S. 279 (1987). As Justice Blackmun presciently observed, the fact that "death is different" was fast becoming a justification for applying "a *lesser* standard of scrutiny" in capital cases. See *id.,* at 347, 348 (dissenting opinion).

Confirming that observation, the Court's 1991 opinion in *Payne* v. *Tennessee*, 501 U. S. 808, overruled *Booth* in short order, giving prosecutors a powerful new weapon in capital cases. At issue in *Payne* was the admission of penalty phase testimony by the mother of a deceased

victim. The woman testified about the effect of the crime on her surviving grandson, who had witnessed the murder of his mother and baby sister and had himself nearly been killed by the same attack. Her testimony powerfully conveyed her grandson's suffering, but "she[d] no light on the defendant's guilt or moral culpability." *Id.*, at 856 (STEVENS, J., dissenting). By its very poignancy, the testimony "encourage[d] jurors to decide in favor of death rather than life on the basis of their emotions rather than their reason." *Ibid.* Yet, despite the inherent danger posed by such testimony, the Court rejected *Booth*'s *per se* rule barring the admissibility of victim impact evidence in capital proceedings. Declaring such evidence to be "simply another form or method of informing the sentencing authority about the specific harm caused by the crime in question," 501 U. S., at 825, the Court held that prosecutors should be permitted to present evidence "offering a quick glimpse of the life which [the] defendant chose to extinguish" and "demonstrating the loss to the victim's family and to society . . . result[ing] from the defendant's homicide," *id.,* at 822 (internal quotation marks omitted).

Given *Payne*'s sharp retreat from prior precedent, it is surprising that neither the opinion of the Court nor any of the concurring opinions made a serious attempt to define or otherwise constrain the category of admissible victim impact evidence. Instead, the Court merely gestured toward a standard, noting that, "[i]n the event that evidence is introduced that is so unduly prejudicial that it renders the trial fundamentally unfair, the Due Process Clause of the Fourteenth Amendment provides a mechanism for relief." *Id.*, at 825. That statement represents the beginning and end of the guidance we have given to lower courts considering the admissibility of victim impact evidence in the first instance.

## II

In the years since *Payne* was decided, this Court has left state and federal courts unguided in their efforts to police the hazy boundaries between permissible victim impact evidence and its impermissible, "unduly prejudicial" forms. Following *Payne*'s model, lower courts throughout the country have largely failed to place clear limits on the scope, quantity, or kind of victim impact evidence capital juries are permitted to consider. See generally, Logan, Through the Past Darkly: A Survey of the Uses and Abuses of Victim Impact Evidence in Capital Trials, 41 Ariz. L. Rev. 143 (1999). Not only have courts allowed capital sentencing juries to hear brief oral or written testimony from close family members regarding victims and the direct impact of their deaths; they have also allowed testimony from friends, neighbors, and co-workers in the form of poems, photographs, hand-crafted items, and—as occurred in these cases—multimedia video presentations. See Blume, Ten Years of *Payne:* Victim Impact Evidence in Capital Cases, 88 Cornell L. Rev. 257, 271–272 (2003) (collecting cases).

Victim impact evidence is powerful in any form.[3] But in each of these cases, the evidence was especially prejudicial. Although the video shown to each jury was emotion-

———————

[3] As one Federal District Judge put it, "I cannot help but wonder if *Payne* . . . would have been decided in the same way if the Supreme Court Justices in the majority had ever sat as trial judges in a federal death penalty case and had observed first hand, rather than through review of a cold record, the unsurpassed emotional power of victim impact testimony on a jury. It has now been over four months since I heard this testimony [in a codefendant's case] and the juror's sobbing during the victim impact testimony still rings in my ears. This is true even though the federal prosecutors in [the case] used admirable restraint in terms of the scope, amount, and length of victim impact testimony." *United States* v. *Johnson*, 362 F. Supp. 2d 1043, 1107 (ND Iowa 2005).

ally evocative, it was not probative of the culpability or character of the offender or the circumstances of the offense. Nor was the evidence particularly probative of the impact of the crimes on the victims' family members: The pictures and video footage shown to the juries portrayed events that occurred long before the respective crimes were committed and that bore no direct relation to the effect of crime on the victims' family members.

Equally troubling is the form in which the evidence was presented. As these cases demonstrate, when victim impact evidence is enhanced with music, photographs, or video footage, the risk of unfair prejudice quickly becomes overwhelming. While the video tributes at issue in these cases contained moving portrayals of the lives of the victims, their primary, if not sole, effect was to rouse jurors' sympathy for the victims and increase jurors' antipathy for the capital defendants. The videos added nothing relevant to the jury's deliberations and invited a verdict based on sentiment, rather than reasoned judgment.

I remain convinced that the views expressed in my dissent in *Payne* are sound, and that the *per se* rule announced in *Booth* is both wiser and more faithful to the rule of law than the untethered jurisprudence that has emerged over the past two decades. Yet even under the rule announced in *Payne*, the prosecution's ability to admit such powerful and prejudicial evidence is not boundless.

These videos are a far cry from the written victim impact evidence at issue in *Booth* and the brief oral testimony condoned in *Payne*. In their form, length, and scope, they vastly exceed the "quick glimpse" the Court's majority contemplated when it overruled *Booth* in 1991. At the very least, the petitions now before us invite the Court to apply the standard announced in *Payne*, and to provide the lower courts with long-overdue guidance on the scope of admissible victim impact evidence. Having decided to tolerate the introduction of evidence that puts a heavy

thumb on the prosecutor's side of the scale in death cases, the Court has a duty to consider what reasonable limits should be placed on its use.